UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------X

MATTHEW SUAREZ,

      Plaintiff,

  - against -

AMERICAN STEVEDORING, INC.,

      Defendant.

-------------------------------------X

**MEMORANDUM & ORDER**

06-CV-6721 (KAM) (RER)

MATSUMOTO, UNITED STATES DISTRICT JUDGE:

      Plaintiff Matthew Suarez ("plaintiff" or Suarez")
brings this action alleging employment discrimination in
violation of Title VII of the Civil Rights Act of 1964, as
amended, 42 U.S.C. §§ 2000, *et seq.* ("Title VII"), 42 U.S.C. §
1981 ("Section 1981"), New York State Executive Law § 296
("NYSEL") and New York City Human Rights Law, Administrative
Code § 8-107 ("NYCHRL"). (*See generally*, Doc. No. 8, Amended
Complaint ("Am. Compl.").)  In this lawsuit, plaintiff claims
that because of his Puerto Rican origin and Hispanic race, he
was subjected to disparate treatment with regard to the terms
and conditions of his employment with defendant American
Stevedoring, Inc. ("defendant" or "ASI"), particularly with
respect to defendant's decisions to train and assign overtime
opportunities, and discharge plaintiff.  Plaintiff also claims
that he was subjected to a hostile work environment based on his

Puerto Rican origin and Hispanic race, and that he experienced retaliation for his participation in protected activities.

Defendant now moves for summary judgment, pursuant to Federal Rule of Civil Procedure 56, seeking dismissal of plaintiff's Amended Complaint. For the reasons set forth herein, defendant's motion is granted in part and denied in part.

## BACKGROUND

The following facts, taken from the parties' statements pursuant to Local Civil Rule 56.1, are undisputed unless otherwise indicated. The court has considered whether the parties have proffered admissible evidence in support of their positions and has viewed the facts in the light most favorable to the nonmoving plaintiff.

### A. American Stevedoring, Inc.

Defendant ASI is a stevedoring company engaged in the business of loading and unloading ships and employs longshoremen to perform these tasks. (Doc. No. 31, Defendant's Rule 56.1 Statement ("Def. 56.1 Stmt.") ¶¶ 1, 3.) Defendant operates two terminals: one in Red Hook, Brooklyn and one in Port Newark, New Jersey. (*Id.* ¶ 1.) All longshoremen who work for defendant are members of the International Longshoremen's Association, AFL-CIO

(the "ILA") Local 1814 (the "Union"). The ILA uses a hiring hall to supply workers to several stevedore companies, including ASI, represented by the New York Shipping Association, Inc. ("NYSA"). (Def. 56.1 Stmt. ¶¶ 3-6, 37.)

At all relevant times, all terms and conditions of employment for Union longshoremen, including defendant's employees, were governed by a collective bargaining agreement ("CBA") entered into by the ILA and the NYSA. (*Id.* ¶¶ 7-8.) Among other things, the CBA governed the hiring, utilization, compensation, discipline and termination of covered longshoremen, and set forth procedures for the filing of any complaint or dispute arising out of a longshoreman's employment, regardless of where the longshoreman was employed. (*Id.* ¶ 8; *see generally*, Declaration of James P. Melia, Ex. A, CBA, Art. XXV, at Bates Nos. 102-107.) The CBA is interpreted and administered jointly by the NYSA-ILA Contract Board (the "Contract Board"), whose decisions on the interpretation and administration of the CBA are final and binding upon all Union members and NYSA-ILA member employers. (*See* Def. 56.1 Stmt. ¶ 10.)

As required by the Waterfront Commission of New York Harbor (the "Waterfront Commission"), a legislatively-created agency that, *inter alia*, regulates longshore employment, an

3

applicant must be "sponsored" by a prospective employer to be employed as a longshoreman. (*See id.* ¶¶ 11, 14.) Once the Waterfront Commission issues a security clearance to the applicant, and the applicant joins the Union, the applicant is placed on their sponsor's list and is the first to be called by the sponsor when needed to work. (*Id.* ¶¶ 14-15.) Longshoremen on defendant's list must report for work unless they have previously indicated that they are unavailable to work. (*Id.* ¶ 17.)

The basic equipment used to move shipping containers at defendant's Brooklyn terminal includes a hustler, a top loader and a reach stacker, each of which has its own training and certification requirements. (*Id.* ¶¶ 19, 20-23.) Training is carried out periodically and candidates for training are selected by seniority. (*Id.* ¶ 23.) Training is conducted individually and if the longshoreman fails to appear for his scheduled training, the training is cancelled and that individual's name is dropped to the bottom of a list of longshoremen waiting to be trained. (*Id.*) Although defendant asserts that an employee trained on a particular machine is assigned to work on that machine based on his seniority (*Id.* ¶ 24), plaintiff contends that defendant "did not comply with its own rules because plaintiff was skipped on the top loader plenty

of times[.]" (Doc. No. 28, Plaintiff's Amended Counter-Statement Pursuant to Rule 56.1 ("Pl. 56.1 Stmt.") ¶ 24.) It is undisputed that a longshoreman need not operate a reach stacker or top loader even if he is qualified to do so. (Def. 56.1 Stmt. ¶ 24.) Instead, he may request to operate a hustler, which is considered by some longshoremen to be an easier and less stressful job. (*Id.*)

A longshoreman's hourly base pay is determined according to his date of entry into the industry. (Def. 56.1 Stmt. ¶ 26.) Hourly skill and position differentials are then added to the base pay. (*Id.*) The hourly skill and position differentials for a hustler, reach stacker and top loader are the same. (*Id.*; CBA, Art. 3 § 5, Bates No. ASI 0017-0018.)

### B. Plaintiff's Employment at ASI

Plaintiff is an individual of Puerto Rican origin and Hispanic race who was employed as a longshoreman at ASI from January 16, 2003 to January 3, 2006. (Def. 56.1 Stmt. ¶¶ 36, 79, 92; *see also* Affidavit of Richard V. Singleton II, Esq. ("Singleton Aff."), Ex. N, Calendar of Absences.) In 2002, ASI sponsored plaintiff and his brother, and both individuals underwent screening by the Waterfront Commission before commencing employment at ASI. (Def. 56.1 Stmt. ¶¶ 30, 32.)

Before commencing employment at ASI, plaintiff attended an NYSA-ILA orientation program, which, *inter alia*, explained NYSA-ILA policies relating to absenteeism and the procedures for filing a grievance under the CBA. (*Id.* ¶ 34.) Plaintiff does not deny that he attended the orientation, or that the program included an explanation of policies relating to absenteeism. (*See* Pl. 56.1 Stmt. 34.) Although plaintiff testified that he knew that he could file grievances about his "work hours" (Singleton Aff., Ex. A, Deposition of Matthew Suarez ("Pl. Dep.") at 107-108), he contends that "[n]obody explained . . . the relationship of NYSI-ILA CBA to the longshoreman's employment or the procedures of filing a grievance[.]" (Pl. 56.1 Stmt. ¶ 34.) During the orientation, plaintiff was also provided with a copy of an employee handbook issued by the Contract Board. (Def. 56.1 Stmt. ¶ 35; Melia Decl., Ex. B, "Employee Handbook.") Among other things, the Employee Handbook explains NYSA-ILA's policies relating to absenteeism and anti-discrimination, and sets forth procedures for filing complaints or grievances with the Union. (Def. 56.1 Stmt. ¶ 35.) Although plaintiff does not deny he was given the Employee Handbook, he asserts that although he "was given a lot of documents at the orientation[,] nobody [sic] explained nor read the Company's harassment policy[.]" (Pl. 56.1 Stmt. ¶ 35; Pl. Dep. at 109.) Plaintiff testified that he did not read

through any of the documents provided to him during the

orientation.  (Pl. Dep. at 189.)

Pursuant to the Employee Handbook

"[a]ny employee who wants to report . . .
unlawful harassment should promptly report the
matter to his or her management supervisor.  If .
. . the employee believes it would be
inappropriate to contact that person, the
employee should immediately contact any other
member of management.  Employees can raise
concerns and make reports without fear of
reprisal.

(Melia Decl., Ex. B, at Bates No. ASI 0312.)

Under the CBA, the NYSA and ILA adopted a joint Anti-

Discrimination and Anti-Harassment Policy for employees covered

by the CBA.  (Def. 56.1 Stmt. ¶ 69.)  The policy and amendments

thereto require employees to make complaints of "job-related

harassment" and other forms of discrimination to "their

management supervisor, designated employer representative, or

the industry EEO Officer."  (Melia Decl., Ex. C and D, NYSA-ILA

Anti-Discrimination Policies, at 8; *see* Def. 56.1 Stmt. ¶ 74.)

Once plaintiff obtained clearance from the Waterfront

Commission and became a member of the Union, plaintiff commenced

employment as a longshoreman.  (Def. 56.1 Stmt. ¶¶ 36-37.)

Plaintiff and his brother had a similar seniority designation

and had priority of employment with ASI, their sponsor. (*Id.* ¶¶ 38-39.) Although plaintiff primarily worked for ASI, he also worked for other NYSA-member employers in and around New York Harbor when requested to do so. (*Id.* ¶ 40; Pl. Dep. at 161-163.) When a longshoreman works for any NYSA-member employer, whether or not it is their sponsor, the terms and conditions of his employment, including policies regarding absenteeism, remain unchanged and are governed by the NYSA-ILA policies and CBA. (*See* CBA, Art. I, at Bates No. ASI 009; Melia Decl., Ex. E, Absentee Procedures.)

All longshoremen at defendant's Brooklyn terminal received equipment assignments from ASI's tractor foreman, Salvatore (Sal) Buzzetta. (Def. 56.1 Stmt. ¶ 43.) Plaintiff asserts that Mr. Buzzetta was his "supervisor." (Pl. 56.1 Stmt. ¶ 43.) It is undisputed that Mr. Buzzetta had no authority to hire, promote, evaluate, suspend, terminate or discipline plaintiff. (Def. 56.1 Stmt. ¶ 45; Pl. Dep. at 269.)

Soon after plaintiff commenced employment with ASI, plaintiff was trained and certified on a hustler and, in March 2005, plaintiff was certified to operate a top loader. (Def. 56.1 Stmt. ¶¶ 45-46; Pl. 56.1 Stmt. ¶ 45-46.) In early 2005, ASI began to acquire reach stackers and started to phase out the less efficient top loaders. (*See* Def. 56.1 Stmt. ¶ 50.) By the

time plaintiff was certified on top loaders, they were "rarely used." (*Id.*) Plaintiff was never trained or certified to operate a reach stacker. (Def. 56.1 Stmt. ¶ 51; Pl. Dep. at 132-133, 160.)

Plaintiff claims that he was denied the opportunity to be trained on a reach stacker because of his race or national origin. (*See* Pl. 56.1 Stmt. ¶ 52; Def. 56.1 Stmt. ¶ 52.) Defendant asserts that it offered to train plaintiff to operate a reach stacker but plaintiff refused. (Doc. No. 31, Affidavit of Sabato Catucci "S. Catucci Aff.") ¶ 30.) Plaintiff never filed a grievance with the Union or complained to anyone about not being trained on the reach stacker. (*See* Pl. Dep. at 224, 237.) Plaintiff's brother was certified on all three machines. (*See* Pl. Dep. at 73-73.)

Defendant further contends that despite plaintiff's certification to operate a top loader, plaintiff requested of Mr. Buzzetta that plaintiff not to be assigned to that machine. (*See* Doc. No. 31, Affidavit of Salvatore Buzzetta ("Buzzetta Aff.") ¶ 4.) Further, Mr. Buzzetta claims that plaintiff was "not good at operating" a top loader and that plaintiff advised him that he preferred to drive a hustler. (*Id.*) Mr. Buzzetta states that he "respected" plaintiff's request and that plaintiff did not request to be assigned to a top loader, nor

complain "that he was not being assigned to that machine." (*Id.*)

By contrast, in an affidavit submitted in response to defendant's instant motion, plaintiff states that he "never expressed a need or wish to operate a hustler to Sal Buzzetta." (Doc. No. 26, Ex. E, Affidavit of Matthew Suarez ("Pl. Aff.") ¶ 9.) Plaintiff states that he "asked Sal Buzzetta plenty of times why I was being skipped over on the top loader for people with less pier seniority than I and he would say 'I can put whoever I want on that machine'." (*Id.*) Notwithstanding, at his deposition, plaintiff testified that he did not believe Mr. Buzzetta's comment because the assignments to work on a particular machine are based on seniority. (*See* Pl. Dep. at 236-237.)

## C. Plaintiff's Allegations of Discrimination and Retaliation

In addition to allegedly being passed over for training, plaintiff testified that while employed at ASI, he was denied overtime on two occasions: once on or about December 24, 2004 and once on or about May 1, 2005. (*See* Pl. Dep. 240-243; Singleton Aff., Ex. J, Grievance dated May 5, 2005.) Although plaintiff "believed" overtime assignments were based on seniority, he did not know "who got the overtime assignments in [his] place[.]" (Pl. Dep. 239-240.) With respect to the former

incident, plaintiff testified that he "just [did not] know why I wasn't brought in." (Pl. Dep. at 241-242.) Plaintiff testified that he filed a grievance concerning that incident and acknowledged that he was paid. (*Id.* at 241.) With respect to the latter incident, plaintiff's grievance states that he returned to work "5 minutes" late and was "refused work, resulting in me missing out on 11 hours of overtime. The reason for me being late was that on that day it was raining pretty heavily so I went home to get some rain gear." (Singleton Aff., Ex. J.)

Plaintiff testified that within the first week of his employment at ASI, Mr. Buzzetta and others directed racial and ethnic slurs at plaintiff. (Pl. Dep. at 91-92, 103-104.) Plaintiff testified that Mr. Buzzetta called him "stuff like spic, half spic, Goya bean, just nasty comments." (*Id.* at 69.) Plaintiff asked Mr. Buzzetta not to "use that type of language," however, Mr. Buzzetta apparently "laughed" and "ignored" plaintiff's protests. (*Id.* at 92.) According to plaintiff, Mr. Buzzetta directed slurs towards plaintiff "[a]lmost on a daily basis" and in the presence of co-workers. (*Id.* at 93-94, 98-99.) Plaintiff testified that on one occasion, while plaintiff was on a break, Mr. Buzzetta told plaintiff, in the presence of co-workers, to "get in the truck you fucking spic, it's time to

go back to work." (*Id.* at 94.)  Plaintiff further testified
that Al Deliso, ASI's timekeeper, used derogatory language
towards plaintiff on a "couple" of occasions and that there
"possibly" were other employees present on these occasions.
(*Id.* at 99-100.)  Plaintiff also testified that other unnamed
people used offensive language towards plaintiff.  (*Id.* at 103-
104.)  Mr. Buzzetta denies using any racially-insensitive
language towards plaintiff.  (Doc. No. 31, Ex. B, Excerpts from
the Deposition of Salvatore Buzzetta ("Buzzetta Dep.") at 61.)

        Plaintiff also points to the testimony of two
witnesses who observed ASI employees engaged in racially-
insensitive banter and racial hostility toward plaintiff.  Clint
Catucci, the Assistant Terminal Manager and Facilities Security
Officer at ASI's Brooklyn terminal, testified that he heard
Hispanics referred to as "Spics."  (Doc. No. 26, Ex. A, Excerpts
from the Deposition of C. Catucci ("C. Catucci Dep.") at 14.)
Mr. Catucci, however, also testified that such comments were
intended to be "joking, . . . nothing harsh . . . like
derogatory towards anyone . . . ."  (*Id.* at 15.)  Further,
plaintiff's co-worker, Equan Womble, testified that he heard Mr.
Buzzetta use discriminatory language toward plaintiff "about
three times a week or so."  (Doc. No. 26, Ex. C, Excerpts from
the Deposition of Equan Womble ("Womble Dep.") at 73.)

Specifically, Mr. Womble testified that Mr. Buzzetta regularly said "get your Puerto Rican ass in the truck, you are a Puerto Rican fuck up, things of that nature." (*Id.*) Mr. Womble also testified that he observed Mr. Buzzetta "put his finger in his [plaintiff's] butt . . . . [and plaintiff] said to stop." (*Id.* at 57.) Plaintiff, however, testified that Mr. Buzzetta never touched his rear end or genitalia. (Pl. Dep. at 271.)

Plaintiff further testified that on one occasion, during the summer of 2005, Mr. Buzzetta threatened plaintiff's physical safety. Specifically, plaintiff testified that

> Me and Equan [Womble] were standing in front of the shack on our break, and Sal Buzzetta came speeding towards us [in his car] and slammed on the brakes and came within a foot of hitting us. So Equan got angry and said what are you doing, and he [Buzzetta] goes shut the fuck up, you dumb n****r . . . .

(Pl. Dep. at 122.) Plaintiff claims that Mr. Womble was prompted to complain to the Waterfront Commission as a result of this incident. (*See id.* at 122-123.)

On August 3, 2005, plaintiff testified, under oath, at a hearing before the Waterfront Commission in support of Mr. Womble's complaint arising from the car incident involving Mr. Buzzetta. (Def. 56.1 Stmt. ¶ 106; *see* Pl. Dep. at 124-125.) At

the hearing, plaintiff testified that Mr. Buzzetta directed racial slurs at African-American co-workers, including Mr. Womble and a female employee. (*See* Singleton Aff., Ex. L, Excerpts from plaintiff's testimony at the hearing on Aug. 3, 2005 ("Hearing Tr.") at 9.) When plaintiff was asked at the hearing whether Mr. Buzzetta directed racial or ethnic slurs at "Latin people, Hispanics . . . or any other Spanish or Hispanic people," plaintiff responded as follows: "No, not that I am aware, not to me. I wouldn't take that, personally . . . I wouldn't take it, I wouldn't take it lightly." (*Id.* at 10.)

At his deposition, plaintiff testified that because he feared retaliation, he did not complain to the Waterfront Commission or to anyone other than Mr. Buzzetta about discrimination he experienced at ASI. (Pl. Dep. at 124-125.) Plaintiff explained that prior to this testimony before the Waterfront Commission, plaintiff was told by a lawyer, who represented neither plaintiff nor Mr. Womble, to be "sure" before plaintiff went "through with the complaint" because Mr. Buzzetta would retaliate. (Pl. Dep. 121, 124-125, 233.) Plaintiff further testified that following his testimony before the Waterfront Commission, he felt threatened because Mr. Buzzetta said "if you make a complaint against me again, you'll see what happens." (Pl. Dep. at 144-145.) Mr. Buzzetta did not

follow through on this threat or engage in any conduct that suggested he would carry out the threat. (*Id.* at 151.) Plaintiff testified, however, that as a result of his testimony before the Waterfront Commission, Mr. Buzzetta's harassment intensified and increased in frequency, and Mr. Buzzetta passed over plaintiff for assignment on the top loader in favor of less senior longshoremen. (*Id.* at 126-130.)

### D. The NYSA-ILA Absenteeism Policy and Plaintiff's Termination

The CBA, which governed the terms of plaintiff's employment, adopted absenteeism policies mandated by the NYSA-ILA. (Def. 56.1 Stmt. ¶ 54; Melia Decl., Ex. E, NYSA-ILA Absenteeism Policies (collectively, the "Absenteeism Policy").) Pursuant to the Absenteeism Policy, all ILA longshoreman, such as plaintiff, were required to report to work as assigned and to remain at work until their assignments were completed. (Def. 56.1 Stmt. ¶ 55.) Additionally, the Employee Handbook states, in relevant part, that

> There are a number of requirements you must meet
> . . . in order to continue your employment in the
> industry. They include the following . . .
> Failure to show up for work as ordered or leaving
> work without your employer's permission will be
> dealt with under terms of the NYSA-ILA Absentee
> Program and could result in the loss of your
> sponsorship and thus, your right to work in the
> industry.

(Melia Decl., Ex. B, Employee Handbook, at 4-5, Bates No. ASI
0308.)  Attendance is monitored and violations of the
Absenteeism Policy are heard and decided, and appropriate
sanctions are imposed by the NYSA-ILA Committee on Absenteeism
("Committee on Absenteeism"), whose decisions are reviewed by
the Contract Board.  (Def. 56.1 Stmt. ¶ 57.)

During plaintiff's employment with ASI, if an ILA
longshoreman violated the Absenteeism Policy, he received a
series of penalties, including warning letters, suspensions and
eventually a permanent bar from industry employment.  (*See
generally*, Def. 56.1 Stmt. ¶¶ 58-65.)  It is undisputed that
from September 23, 2003 through October 24, 2007, a total of 23
longshoremen, including plaintiff, were permanently barred from
the industry for violations of the Absenteeism Policy.  (*Id.* ¶
68; *see also* Melia Decl., Ex. K, List of Permanently Barred
Individuals.)

Under the Absenteeism Policy that was in effect from
January 1, 2003 through September 30, 2005, a longshoreman could
violate the Absenteeism Policy ten times before being suspended
for three months from industry employment.[1]  (*Id.* ¶ 58.)  A

_____

[1] Under the relevant Absenteeism Policy, the fifth violation
resulted in a one-week suspension, the sixth violation resulted
in a two-week suspension, the seventh violation resulted in a
three-week suspension, the eighth violation resulted in "the
deletion from the pier or gang list," and the ninth violation

longshoreman returning from a three-month suspension would start with a "clean attendance record." (*Id.* ¶ 59.)  Upon the second series of violations leading to the tenth violation of the Absenteeism Policy, a permanent bar from industry employment would be imposed.  (*Id.*)  A longshoreman who faces a three-month suspension or permanent bar may explain to the Committee on Absenteeism why sanctions should not be imposed.  (*Id.* ¶ 60.)

Effective October 1, 2005, the NYSA-ILA instituted a stricter Absenteeism Policy, which imposed a permanent bar from industry employment following the first ten violations.  (*Id.* ¶ 63.)  It did not provide for a "clean record" after the first occurrence of the tenth violation.  (*Id.*)

It is undisputed that the Committee on Absenteeism warned plaintiff numerous times about his repeated violations of the Absenteeism Policy.  (Def. 56.1 Stmt. ¶ 81; Pl. 56.1 Stmt. ¶ 81; Singleton Aff., Ex. K, Absenteeism Related Correspondence.)  The warning letters advised plaintiff that "[a]bsenteeism and leaving work early hurt our productivity and our ability to compete with other ports.  It also can jeopardize workplace safety." (*See, e.g.,* Singleton Aff., Ex. K, Letters dated 10/8/03, 10/22/03, 3/3/04, 3/17/04, 6/2/04, 6/16/04, 6/23/04,

---

resulted in a letter warning that the next violation would result in a three-month suspension from industry employment. (Def. 56.1 Stmt. ¶ 58.)

6/1/05, 6/22/05, 6/29/05, 7/20/05, 8/10/05, 9/7/05, 1/11/06, 1/18/06.)  Notwithstanding these warning, plaintiff continued to be absent.  (Def. 56.1 Stmt. ¶ 81; Pl. 56.1 Stmt. ¶ 81.)

During his employment with ASI, plaintiff was suspended on 11 occasions for periods ranging from one week to three months for unexcused violations of the Absenteeism Policy related to his employment at ASI and other NYSA-member employers at which plaintiff had accepted employment.  (*See* Def. 56.1 Stmt. ¶ 83.)  Although plaintiff does not dispute this fact, he contends that he "was suspended and terminated from his employment because of his national origin and as well as retaliation for going to [sic] Waterfront Commission and with Mr. Womble to file a complaint against Sal Buzzetta . . . ."  (Pl. 56.1 Stmt. ¶ 83.)

Before receiving a three-month suspension for violations of the Absenteeism Policy, on June 2, 2004, plaintiff attended a hearing before the Committee on Absenteeism.  (Def. 56.1 Stmt. ¶ 86; Melia Decl., Ex. F, Minutes.)  During this hearing, plaintiff explained that he did not have a car and could not afford one.  (*See id.*)  When asked whether he liked his job, plaintiff responded, "Yes.  I like this job very much."  (*Id.*)  Plaintiff did not mention at the June 2004 hearing that

18

he was absent from work due to discrimination, retaliation or a hostile work environment at ASI. (Pl. Dep. at 179, 183.)

By contrast, at his deposition, plaintiff testified that he was absent from work at ASI because he "had personal problems" coping with Mr. Buzzetta's discriminatory conduct. (*See* Pl. 56.1 Stmt. ¶ 89; Pl. Dep. at 178.) Plaintiff testified that he "was stressed out with what I was dealing with at work that I didn't really want to be there." (*Id.*) Notwithstanding, plaintiff also testified that the "bulk" of his unexcused absences leading to his three-month suspension were caused by his inability to access other ports at which he had accepted employment, rather than his desire not to work at ASI. (Pl. Dep. at 179, 183.)

Following plaintiff's return to work from his three-month suspension, from October 1, 2004 through September 30, 2005, plaintiff accumulated nine violations of the Absenteeism Policy for failing to report to work and one violation for leaving work early. (*Id.* ¶¶ 90-91.) As a result of plaintiff's continued attendance issues, and following a hearing before the Committee on Absenteeism, on December 20, 2005, plaintiff was permanently barred from industry employment. (*Id.* ¶¶ 92-93.)

During a hearing on December 19, 2005 to determine whether plaintiff should be permanently barred from the

industry, plaintiff was asked by James Melia, the Executive Vice President of Operations and Chief Operating Officer of the NYSA, why plaintiff should be permitted to "continue working in the industry." (Melia Decl., Ex. G, Minutes, Bates Nos. ASI 0569 – ASI 0571.) Plaintiff testified, "I have problems with my lungs. They are not inflating properly. . . . I think the industry has caused this problem. I drive a hustler, sometimes for long periods of time. . . . The trucks I drive are dirty and dusty. You keep breathing this and it has to cause problems." (*Id.*) When plaintiff was reminded that he had previously served a three-month suspension, plaintiff testified "[t]hat was because I didn't have a car to get to work." (*Id.*, Bates No. ASI 0571.) Plaintiff did not indicate that he was absent from work due to discrimination, retaliation or a hostile work environment at ASI. After considering plaintiff's testimony and other evidence, the Committee on Absenteeism permanently barred plaintiff from "further employment in the industry . . . ." (Melia Decl., Ex. G, Bates No. ASI 0571.)

By letter dated December 29, 2005, plaintiff appealed the Committee on Absenteeism's decision to the Contract Board. (Melia Decl., Ex. H, Appeal Letter.) On January 17, 2006, the decision was affirmed by the Contract Board and plaintiff was

permanently barred from employment by the NYSA-ILA. (*See* Def. 56.1 Stmt. ¶ 97; *see also* Pl. Dep. at 249-250.)

Although plaintiff concedes that he was terminated from employment by the NYSA-ILA's Committee on Absenteeism and the Contract Board, plaintiff testified that "I know that I was terminated by the New York Shipping [Association], but I do believe it was because of the influence of American Stevedoring." (Pl. Dep. at 249-250.)

**E. Procedural History**

On or about May 24, 2006, plaintiff filed a Charge of Discrimination with the EEOC, alleging discrimination on the basis of sex, national origin, and retaliation. (Singleton Aff., Ex. O, Charge of Discrimination (the "Charge").) Although the parties have not submitted evidence regarding the outcome of the EEOC's investigation plaintiff alleges that the EEOC issued a Notice of Right to Sue on or about September 29, 2006. (Am. Compl. ¶ 11.) Thereafter, on or about December 22, 2006, plaintiff commenced the instant federal action alleging discrimination on the basis of national origin, race and retaliation. (*See* Doc. No. 1, Complaint ¶ 1.)

## DISCUSSION

### A. Summary Judgment Standard

A court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "A fact is 'material' for these purposes when it might affect the outcome of the suit under the governing law." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation and internal quotation marks omitted). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation and internal quotation marks omitted). Moreover, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, . . . or is not significantly

probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. *Flanigan v. General Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001). Nevertheless, the nonmoving party may not rest "merely on allegations or denials" but must instead "set out specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Harlen Assocs. v. Incorporated Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) ("[M]ere speculation and conjecture is [sic] insufficient to preclude the granting of the motion.")

"Employment discrimination cases raise special issues on summary judgment." *Kenney v. New York City Dep't of Educ.*, No. 06-CV-5770, 2007 U.S. Dist. LEXIS 77926, at *7 (S.D.N.Y. Oct. 22, 2007). Specifically, employment discrimination cases that involve a dispute concerning the "employer's intent and motivation," may not be suitable for summary judgment. *Id.* The Second Circuit has noted, however, that "we went out of our way to remind district courts that the impression that summary

judgment is unavailable to defendants in discrimination cases is unsupportable." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 44 (2d Cir. 2000) (internal quotation marks and citations omitted); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("trial courts should not 'treat discrimination differently from other ultimate questions of fact.'") (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 524 (1993)).

### B. Plaintiff's Disparate Treatment Claims

Plaintiff's claims of disparate treatment based on national origin and race, brought pursuant to Title VII, the NYSEL, and Section 1981[2], are all analyzed under the three-step burden shifting framework established in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *Jenkins v. New York City Transit Auth.*, 201 Fed. Appx. 44, 45-46 (2d Cir. 2006) ("A plaintiff's efforts to establish [intentional race discrimination under] . . . § 1981 . . . are subject to the same burden-shifting analysis as intentional discrimination claims

---

[2] Although not raised by the parties, the court will dismiss plaintiff's national origin-based claim of intentional discrimination under Section 1981 because that statute does not apply to discrimination on the basis of national origin. *See Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1981); *Lueck v. Progressive Ins., Inc.*, No. 09-CV-6174, 2009 U.S. Dist. LEXIS 96492, at *12-13 (W.D.N.Y. Oct. 19, 2009); *Desir v. Concourse Rehab. & Nursing Ctr.*, No. 06-CV-1109, 2008 U.S. Dist. LEXIS 14965, at *10 n.4 (S.D.N.Y. Feb. 28, 2008).

brought under Title VII"); *Weinstock*, 224 F.3d at 42 n.1
(employment discrimination claims under the NYSEL are subject to
the same standard of proof as claims under Title VII); *Patterson*
*v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004).

Initially, the plaintiff bears the burden of
establishing a *prima facie* case of discrimination.  To establish
a *prima facie* case, the plaintiff must show that (1) he is a
member of a protected class, (2) he was qualified for his job,
(3) he suffered an adverse employment action, and (4) such
adverse employment action occurred under circumstances giving
rise to an inference of discrimination.  *McDonnell-Douglas*, 411
U.S. at 802-803.  The Second Circuit has "characterized this
burden as 'de minimis:' it is 'neither onerous, nor intended to
be rigid, mechanized or ritualistic.'"  *Beyer v. County of*
*Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Abdu-Brisson*
*v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001)).

Once the plaintiff has established a *prima facie* case,
the burden shifts to the defendant to articulate a legitimate,
non-discriminatory reason for the alleged adverse employment
action.  *McDonnell Douglas*, 411 U.S. at 802-803.  The employer's
"burden is one of production, not persuasion . . . and involves
no credibility assessment of the evidence."  *Pathare v. Klein*,
No. 06-CV-2202, 2008 U.S. Dist. LEXIS 69119, at *12 (S.D.N.Y.

Sept. 12, 2008) (citations omitted).  At this stage, the
employer "must present a clear explanation for the action."
*Id.* (citation omitted).

If the employer meets its burden, the plaintiff must
present evidence to show that the employer's reason is a mere
pretext for an impermissible discriminatory motive.  *McDonnell-
Douglas*, 411 U.S. at 804; *McPherson v. New York City Dep't of
Educ.*, 457 F.3d 211, 216 (2d Cir. 2006).  In the summary
judgment context, this means the plaintiff must "establish a
genuine issue of material fact either through direct,
statistical, or circumstantial evidence as to whether the
employer's reason for its decision to discharge is false and as
to whether it is more likely that a discriminatory reason
motivated the employer to make the adverse employment decision."
*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d
1219, 1225 (2d Cir. 1994).

Defendant contends that plaintiff has not made out a
*prima facie* case of discrimination and that, even if he has,
plaintiff cannot demonstrate that defendant's stated reasons for
its actions are a pretext for unlawful discrimination.

### 1. *Prima Facie* Case

Although there is no dispute that plaintiff is a member of a protected class based on his Puerto Rican origin and Hispanic race, satisfying the first element of the *prima facie* case, defendant contends that plaintiff has failed to satisfy the latter three elements of the *prima facie* analysis. (*See* Doc. 31, Defendant's Mem. of Law ("Def. Mem.") at 5.)

### a. Qualification for the Position

With respect to the second element, to be considered "qualified" for the position, a plaintiff generally must demonstrate only a "basic eligibility" for the position. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91-92 (2d Cir. 2001) (ADEA claim); *see also Cramer v. Pyzowski*, 04-CV-1122, 2007 U.S. Dist. LEXIS 38375, 2007 WL 1541393, at *6 (E.D.N.Y. May 25, 2007) (requiring plaintiff to show possession of basic skills comports with the *de minimis prima facie* burden).  The Second Circuit has cautioned that this prong should not be interpreted so "as to shift onto the plaintiff an obligation to anticipate and disprove, in his *prima facie* case, the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Slattery*, 248 F.3d at 92.

In proffering its non-discriminatory basis for its employment action, defendant contends that plaintiff was not qualified to be a longshoreman because of his "chronic absenteeism[.]" (Def. Mem. at 6.) Referencing the Employee Handbook, defendant points out that attendance is among "a number of requirements you must meet . . . in order to continue your employment in the industry." (Employee Handbook, at 4-5, Bates No. ASI 0308.) Plaintiff's opposing Memorandum of Law ("Pl. Mem.") does not appear to address defendant's argument that plaintiff was unqualified for the position due to his chronic absenteeism. (*See generally*, Doc. No. 26, Pl. Mem.)

To be sure, the undisputed evidence of plaintiff's many unexcused absences, the numerous letters issued by the NYSA-ILA warning plaintiff of the consequences of his absences, and plaintiff's repeated suspensions clearly indicate "regular attendance to be an important criterion for job performance." *See Perez v. Communications Workers of America Local 1109*, No. 03-CV-3740, 2005 WL 2149204, at *9 (E.D.N.Y. Sept. 6, 2005) (finding that the plaintiff had failed to establish that he "performed his job satisfactorily" and concluding that "[a]ll the reprimands, warnings and counseling that plaintiff received as a result of his excessive absenteeism" established that "regular attendance" was an important job qualification).

Further, the court recognizes that "[e]xcessive absenteeism has been repeatedly cited by courts as evidence of lack of satisfactory job performance." *Id.* (quoting *Hendrics v. National Cleaning Contractors, Inc.*, No. 95-CV-5240, 1998 WL 26188, at *3 (S.D.N.Y. Jan. 26, 1998)).

Nevertheless, the court is mindful of the Second Circuit's admonition in *Slattery* that, in evaluating the qualification prong, the court must not demand plaintiff to establish that "he was performing his duties satisfactorily." *See* 248 F.3d at 91. In that case, the Second Circuit observed that where, as here, "the employer has already hired the employee, the inference of minimal qualification is not difficult to draw." *Id.* at 92; *see also Arrocha v. City Univ. of New York*, 02-CV-1868, 2004 U.S. Dist. LEXIS 4486, at *11 (E.D.N.Y. Feb. 9, 2004) ("When, as here, the employer has retained the plaintiff for a substantial amount of time, it can be inferred that the plaintiff possesses at least the basic skills necessary for the performance of the job he or she is performing. . . . As plaintiff was an adjunct instructor . . . for two years, he has demonstrated that he possessed the basic skills necessary for performance of the position.") (citing *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001)).

Notwithstanding plaintiff's irregular attendance record, the court concludes that the evidence sufficiently establishes that plaintiff was minimally qualified to perform duties of a longshoreman at ASI. The undisputed evidence establishes that ASI initially sponsored plaintiff's employment contingent upon his clearance by the Waterfront Commission, which he obtained. (*See* Def. 56.1 Stmt. ¶¶ 36-37.) It is also undisputed that plaintiff worked at ASI, among other NYSA-member employers, for nearly three years. (*See* Def. 56.1 Stmt. ¶¶ 36, 79, 92.) Accordingly, plaintiff has satisfied the second element of his *prima facie* discrimination case.

### b. Adverse Employment Action

With respect to the third element of the *prima facie* analysis, the Supreme Court has stated that an "adverse employment action" must be "tangible" or "material." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (citation and internal quotation marks omitted).

Defendant contends that it is not liable for discriminatory discharge because the NYSA-ILA, not defendant ASI, terminated plaintiff's employment. (*See* Def. Mem. at 6.) Although termination of employment is unquestionably an adverse employment action, *see, e.g., Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)), there is no dispute that non-party NYSA-ILA permanently barred plaintiff from industry employment. (*See* Def. 56.1 Stmt. ¶ 97.)

Plaintiff asserts that "I know that I was terminated by the New York Shipping [Association], but I do believe it was because of the influence of American Stevedoring." (Pl. Dep. at 249-250.) The record, however, is devoid of any evidence to support plaintiff's speculative assertion.

In fact, plaintiff acknowledged that he had no "facts" or "documentation" to "show that ASI was in any way involved in causing [plaintiff] to be permanently barred from employment in the industry." (*See* Pl. Dep. at 211.) Indeed, all warning letters and suspensions were issued by the NYSA-ILA. (*See* Singleton Aff., Ex. K, Absenteeism Related Correspondence; *see also* Def. 56.1 Stmt. ¶¶ 81, 83; Pl. 56.1 Stmt. ¶¶ 81, 83; Def. Mem. at 6.) Further, James Melia, Co-Chairman of the NYSA-ILA Committee on Absenteeism, states that "ASI has no input into or influence over the process or decisions of either the Committee

31

on Absenteeism or the Contract Board." (Melia Decl. ¶ 17.)
Accordingly, plaintiff has failed to present any admissible
evidence sufficient to raise a triable issue of fact as to
whether plaintiff's termination was ordered or otherwise
"influenced" by ASI.

In addition to his discharge, plaintiff alleges that
he was "given the less desireable [sic] jobs" and, as a result
of the discriminatory work assignments by Mr. Buzzetta,
plaintiff had fewer overtime opportunities. (Pl. Mem. at 23.)
Generally, the denial of training and overtime opportunities
constitutes an adverse employment action, *see Little v. National
Broad. Co.*, 210 F. Supp. 2d 330, 381 (S.D.N.Y. 2002) (citation
omitted), especially when it bears on either plaintiff's
opportunities for professional growth and career advancement or
directly on plaintiff's compensation. *See Hill v. Rayboy-
Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006). Where,
however, a plaintiff cannot establish material harm from such
denials, there is no adverse employment action. *See id.*
(citation and internal quotation marks omitted).

Here, even assuming that plaintiff was not assigned to
the top loader or trained on the reach stacker, there is no
evidence that plaintiff's assignment to the hustler constitutes
an adverse employment action. The undisputed evidence

establishes that top loader, reach stacker and hustler operators are compensated equally. (*See* Def. 56.1 Stmt. ¶ 26.) Nor is there any evidence that assignment to a hustler interfered with or precluded plaintiff's job performance and professional growth, or created "unreasonably dangerous" work conditions. *Cf. Edwards v. Metro-North Commuter R.R. Co.*, No. 04-CV-1430, 2006 U.S. Dist. LEXIS 70211, at *16 (D. Conn. Sept. 27, 2006) (holding that employer's failure to provide employee with certain protective equipment could be an adverse employment action because it exposed employee to "potentially unreasonably dangerous working conditions"); *see Wells-Williams v. Kingsboro Psychiatric Ctr.*, No. 03-CV-134, 2007 U.S. Dist. LEXIS 23727, at *10 (E.D.N.Y. Mar. 30, 2007) (assignment of adequate but less desirable kitchen knives to chef was a "mere inconvenience," not an adverse employment action). Accordingly, plaintiff has not established that he suffered an adverse employment action by ASI.

### c. Inference of Discrimination

With respect to the fourth element of the *prima facie* analysis, which requires plaintiff to establish that he suffered an adverse employment action, defendant contends that the employment actions of which plaintiff complains did not occur

under circumstances giving rise to an inference of discrimination. (*See* Def. Mem. 10-13.) The court agrees.

As to plaintiff's discharge from ASI, the undisputed evidence compels the court's finding that the NYSA-ILA, not defendant, ordered plaintiff permanently barred from industry employment. As discussed above, there is no evidence to suggest that ASI had any influence over the decision of the NYSA-ILA to bar plaintiff from employment or that ASI could have continued to sponsor or employ plaintiff notwithstanding the permanent bar. To the contrary, it is undisputed that from September 23, 2003 through October 24, 2007, a total of 23 longshoremen, including plaintiff, were permanently barred from the industry for violations of the Absenteeism Policy. (Def. 56.1 Stmt. ¶ 68; *see also* Melia Decl., Ex. K, List of Permanently Barred Individuals.) Nor does the evidence suggest that policies with respect to absenteeism or termination were applied in a discriminatory manner. Thus, plaintiff has failed to raise an inference of discrimination arising from his termination.

Further, the court finds that plaintiff presents no specific evidence of disparate treatment in the availability of training opportunities sufficient to raise an inference of discrimination. Plaintiff states in his affidavit that he was denied training on the reach stacker "even though Italian

workers with less pier seniority were trained and certified" and "despite [his] requests to Sal Buzzetta." (Pl. Aff. ¶¶ 10-11.) It is undisputed that several Hispanic employees of Puerto Rican origin, including plaintiff's brother, were certified on top loaders, as was plaintiff, and on reach stackers. (Def. 56.1 Stmt. ¶ 53.) Plaintiff contends that these Hispanic employees were so trained and certified because "they never complained to anybody about ASI's discriminatory practices." (Pl. Aff. ¶ 23; see Pl. 56.1 Stmt. ¶ 53.) Yet, plaintiff also did not complain about discrimination or file a grievance. (*Id.* at ¶¶ 12, 15.) Thus, plaintiff's conclusory allegation of disparate treatment is contradicted by his own affidavit and not otherwise supported by admissible evidence. Nor does plaintiff have any personal knowledge on which he bases his assertion regarding the lack of complaints by other Hispanic employees. *See Patterson*, 375 F.3d at 219 (affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein.") (citing Fed. R. Civ. P. 56(e)); *see also* Fed. R. Evid. 602 ("[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

Similarly, there is no evidence to indicate that
unlawful discrimination played any role in plaintiff's loss of
overtime opportunities.  Instead, plaintiff testified that he
"believed" overtime assignments were based on seniority, but
conceded that he did not know "who got the overtime assignments
in [his] place[.]"  (*See* Pl. Dep. 239-240.)  The record reflects
that plaintiff's loss of overtime claim is based on two
incidents, both of which occurred prior to plaintiff's testimony
before the Waterfront Commission: one arising on or about
December 24, 2004 and another arising on or about May 1, 2005.
(*See* Pl. Dep. 240-243; Singleton Aff., Ex. J, Grievance dated
May 5, 2005.)  With respect to the first incident regarding
overtime, plaintiff testified that he "just [did not] know why I
wasn't brought in."  (Pl. Dep. at 241-242.)  Plaintiff testified
that he filed a grievance concerning that incident and
acknowledged that he was paid.  (*Id.* at 241.)  With respect to
the second incident, plaintiff's grievance states that he
returned to work "5 minutes" late and was "refused work,
resulting in me missing out on 11 hours of overtime."
(Singleton Aff., Ex. J.)  After full discovery, there is no
evidence to indicate that plaintiff, or other Hispanic or Puerto
Rican employees were denied overtime based on national origin or
race.  Thus, the court concludes that no reasonable fact finder

could find that plaintiff lost overtime due to unlawful discrimination.

Plaintiff has thus failed to establish a *prima facie* case of disparate treatment discrimination. Accordingly, plaintiff's disparate treatment claims based on national origin and race brought under Title VII, Section 1981, the NYSEL and the NYCHRL must be dismissed.

## 2. Defendant's Legitimate, Nondiscriminatory Reasons

Even assuming, *arguendo*, that plaintiff had established a *prima facie* case, defendant clearly satisfies its burden of production at the second stage of the *McDonnell Douglas* analysis to articulate a legitimate, non-discriminatory reason for its actions. Defendant has made clear, through admissible evidence, that it withdrew plaintiff's sponsorship and effectively terminated plaintiff's employment because of his well-documented history of absenteeism and the resulting permanent bar from industry employment by the NYSA-ILA's Committee on Absenteeism and the Contract Board. (*See, e.g.*, Def. 56.1 Stmt. ¶¶ 83-84, 91, 93, 96-97; Singleton Aff., Ex. K, Absenteeism Related Correspondence; Ex. N, Calendar of Absences.) *See Stephen v. Maximum Sec. & Investigations, Inc.*, No. 99-CV-4313, 2000 U.S. Dist. LEXIS 17335, at *17 (S.D.N.Y. Dec. 4, 2000) (finding that the plaintiff's "history of 'no-

shows/no-calls' and the perception of his increasing unavailability for work constituted a legitimate, nondiscriminatory reason for his termination."). Indeed, plaintiff testified that he was often late for work or absent due to his inability to access other ports at which he had accepted employment. (*See, e.g.,* Pl. Dep. at 163, 179, 183.)

### 3. Pretext

Plaintiff relies on two bases to counter defendant's stated legitimate, non-discriminatory reasons for its actions. (*See* Pl. Mem. at 22-25.) First, plaintiff contends that defendant improperly exerted influence over the NYSA-ILA, which resulted in plaintiff's termination. As stated above, other than plaintiff's own speculative assertion, there is no evidence to support this position; instead, the overwhelming evidence indicates that the NYSA-ILA acted independently of defendant. Second, plaintiff asserts that "there were a lot of other employees, who had absenteeism problems worse than Plaintiff, some of whom were even caught using drugs, and they were never fired . . . ." (Pl. Mem. at 25.) Plaintiff ignores the record. At his deposition, plaintiff described only a "skinny guy" whose record of absences "[m]aybe not exactly exceeded [plaintiff's], but I know the person was out quite a lot and they were not terminated." (Pl. Dep. at 212-213.) Putting aside the fact

that there is no evidence concerning this unidentified individual's national origin or race sufficient to raise an inference of discrimination, plaintiff's testimony is entirely speculative and based on plaintiff's opinion, not personal knowledge.  The court notes that the unidentified "skinny guy" could have been absent for any number of reasons, including reasons for which he was excused from work.  Moreover, as previously noted, from September 23, 2003 through October 24, 2007, a total of 23 longshoremen, including plaintiff, were permanently barred from the industry for violations of the Absenteeism Policy.  (Def. 56.1 Stmt. ¶ 68; *see also* Melia Decl., Ex. K, List of Permanently Barred Individuals.)

Rather than produce evidence from which a reasonable jury could find that defendant's reasons are a pretext for unlawful discrimination, plaintiff attempts to avoid undisputed facts in the record.  Because plaintiff has failed to establish a *prima facie* case of discrimination, and because no reasonable jury could conclude from the record that defendant's stated reasons are a pretext for unlawful discrimination, defendant is granted summary judgment on plaintiff's state and federal disparate treatment claims.

**C. Plaintiff's Hostile Work Environment Claims**

To establish a claim of hostile work environment, a plaintiff must establish that (1) his workplace was permeated with discriminatory intimidation, ridicule and insult sufficiently severe or pervasive to alter the conditions of his work environment and (2) a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). The legal standard applied to a hostile work environment claim under the NYSEL is the same as that applied under Title VII. *See Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 623 (S.D.N.Y. 2009) (citing *Dawson v. Bumble & Bumble*, 398 F.3d 211, 217 (2d Cir. 2005); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305 n.3 (N.Y. 2004)).

The conduct in question "must be severe or pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Schwapp*, 118 F.3d at 110 (quoting *Harris*, 510 U.S. at 22). The first element of a hostile work environment claim requires allegations that demonstrate that the environment was both objectively and subjectively hostile and abusive. *See Gregory*, 243 F.3d at 691-692.

In determining whether a workplace is objectively hostile, a court should look at the "totality of the circumstances." *Harris*, 510 U.S. at 23. In particular, courts should examine "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* When evaluating the "quantity, frequency, and severity" of the incidents, the court must look at the incidents "cumulatively in order to obtain a realistic view of the work environment." *Schwapp*, 118 F.3d at 111. "[O]ffhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation marks and citation omitted). By contrast, "a steady barrage of racially discriminatory comments can provide a basis for a jury's reasonable finding that plaintiff was subjected to a hostile work environment." *See King v. Interstate Brands Corp.*, No. 02-CV-5470, 2009 U.S. Dist. LEXIS 36594, at *56 (E.D.N.Y. Apr. 29, 2009) (citation omitted).

Moreover, "[r]acial . . . epithets need not be directed at an employee to contribute to a hostile work environment, because 'evidence of harassment of [other members

of the protected group], if part of a pervasive or continuing pattern of conduct, [is] surely relevant to show the existence of a hostile work environment.'" *Little*, 210 F. Supp. 2d at 153 (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997)); see *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) ("Remarks targeting members of other minorities . . . may contribute to the overall hostility of the working environment for a minority employee."); *Cf. Leibovitz v. New York City Transit Authority*, 252 F.3d 179, 186 (2d Cir. 2001) (holding that Title VII's prohibition against hostile work environment discrimination affords no claim to a person who experiences it solely "by hearsay" where alleged hostility was "out of [plaintiff's] . . . sight and regular orbit").

As a preliminary matter, defendant argues that plaintiff's deposition testimony concerning alleged derogatory remarks made by Salvatore Buzzetta should not be credited because it is "flatly contradicted by Plaintiff's own sworn testimony given in connection with a Waterfront Commission investigation." (Def. Mem. at 15.) Defendant points to plaintiff's August 3, 2005 sworn testimony before the Waterfront Commission:

> Q: Now, does he [Buzzetta] direct racial slurs
>    or ethnic slurs at Latin people, Hispanics,

>           does he do this to you or any other Spanish or
>           Hispanic people?
>
>       A: No, not that I am aware, not to me.  I
>           wouldn't take that, personally.

(Singleton Aff., Ex. L, at Bates No. ASI 01386.)

Although the general rule is that district courts may not assess a witness's credibility at the summary judgment stage, *see e.g., Anderson*, 477 U.S. at 255, the Second Circuit has recognized a narrow exception to this well-established rule. In *Jeffreys*, the Second Circuit held that

>       the District Court did not err in granting
>       defendants' motion for summary judgment on the
>       basis that [plaintiff's] testimony — which was
>       largely unsubstantiated by any other direct
>       evidence — was so replete with inconsistencies
>       and improbabilities that no reasonable juror
>       would undertake the suspension of disbelief
>       necessary to credit the allegations made in his
>       complaint.

*Jeffreys*, 426 F.3d at 555 (quotation marks and citation omitted) (affirming summary judgment on plaintiff's claim that he was beaten and thrown out of window by police officers because plaintiff was unable to provide any identifying features of officers that allegedly attacked him, could not recall the number of police officers present, and had confessed to jumping out of window on three separate occasions).  Thus, "in the 'rare circumstances' where the sole basis for the disputed issues of

fact are statements by the plaintiff[,]" summary judgment may be granted. *Cf. Blake v. Race*, 487 F. Supp. 2d 187, 202 (E.D.N.Y. 2007) (court refused to grant summary judgment despite significant evidence that the non-party witness had previously provided false testimony) (citing *Jeffreys*, 426 F.3d at 555).

Defendant is correct that plaintiff's past testimony before the Waterfront Commission raises serious doubts as to plaintiff's credibility. Whereas before the Waterfront Commission plaintiff outright denied being subjected to any hostility toward Hispanics, at his deposition, plaintiff testified that Mr. Buzzetta and others called plaintiff a "spic, half spic, Goya bean" on a daily basis. (*See* Pl. Dep. at 69.)

Although plaintiff has, in effect, admitted that he lied under oath regarding alleged hostility directed at him by Mr. Buzzetta and others, the court, in an excess of caution, finds that the inconsistency is not fatal to plaintiff's claim at this stage. Plaintiff testified that he feared retaliation by Buzzetta and that, prior to his testimony before the Waterfront Commission on behalf of Mr. Womble, he had been warned by a lawyer, who represented neither plaintiff nor Mr. Womble, to be "sure" before plaintiff went "through with the complaint" because Buzzetta would retaliate. (Pl. Dep. 121, 124-125, 233.) Thus, although the court has serious concerns

regarding plaintiff's misrepresentation under oath, in view of
plaintiff's explanation, the court does not find plaintiff's
testimony to be "so replete with inconsistencies and
improbabilities that no reasonable juror would undertake the
suspension of disbelief necessary to credit the allegations made
in his complaint." *See Jeffreys*, 426 F.3d at 555.  Thus, the
court finds that the determination of plaintiff's credibility
should be left to a jury.

### 1. "Severe or Pervasive" Harassment

Defendant contends that "even accepting Plaintiff's
allegations as true, the language that was allegedly used
towards him in the workplace was not sufficiently severe or
pervasive so as to alter his working environment."  (Def. Mem.
at 16.)  The court disagrees.

With respect to the first element of the analysis,
which determines whether a hostile work environment can be
established, the court finds that plaintiff has set forth
sufficient evidence to raise a genuine issue of material fact as
to whether the workplace was permeated with discriminatory
harassment that was sufficiently severe or pervasive as to alter
the conditions of plaintiff's work environment.  Plaintiff has
put forth evidence that he was subjected to a steady stream of
racial and ethnic slurs during the course of his three-year

tenure at ASI. (*See* Pl. Dep. at 91-94, 103-104.) Plaintiff testified that from January 2003 to January 2006, "[a]lmost on a daily basis," Mr. Buzzetta referred to plaintiff as a "spic," "fucking spic," "half spic," and a "Goya bean" in the presence of co-workers. (*Id.* at 69, 94.) Plaintiff also testified that Al Deliso, ASI's timekeeper, directed racial slurs at plaintiff "a couple [of] times." (*Id.* at 99.) Plaintiff testified that he asked Buzzetta not to "use that type of language," however, Mr. Buzzetta apparently "laughed" and "ignored" plaintiff's protests. (*Id.* at 92.) Plaintiff also testified that on one occasion, Mr. Buzzetta threatened plaintiff's physical safety by nearly hitting plaintiff with his car. (*See* Pl. Dep. at 122.) This latter incident, as described by plaintiff, may be sufficiently severe on its own to support plaintiff's hostile work environment claim.

Plaintiff also points to the testimony of two ASI employees who observed racially-insensitive banter and racial hostility toward plaintiff: Mr. Womble, plaintiff's co-worker, and Clint Catucci, ASI's Assistant Terminal Manager and Facilities Security Officer. Mr. Womble testified that he heard Mr. Buzzetta refer to plaintiff as a "Puerto Rican ass or fucking Puerto Rican" and make other similar comments "about three times a week or so." (Womble Dep. at 73.) Mr. Catucci

testified that although he heard Hispanics referred to as "Spics," he believed that the comments were intended to be "joking . . . ." (C. Catucci Dep. at 14-15.)

As further evidence of a hostile work environment at ASI, plaintiff points to racial hostility toward African-American co-workers. Specifically, the record reflects that Buzzetta referred to Mr. Womble as a "dumb n****r" and a female co-worker as a "monkey." (Pl. Dep. at 122; Hearing Tr. at 9.)

Viewing the record in the light most favorable to plaintiff, there is sufficient evidence upon which a jury could reasonably conclude that plaintiff experienced pervasive discriminatory ridicule and insult because of his Puerto Rican origin and Hispanic race. "Further, as the nature of these incidents are racially-related on their face — not neutral incidents — plaintiff has put forth sufficient evidence to support his claim, for purposes of surviving summary judgment, that these actions are related to his race." *See King*, 2009 U.S. Dist. LEXIS 36594, at *38-39 (denying the defendant's summary judgment motion where plaintiff, an African-American male, presented evidence that he was subjected to a "steady stream of 'vicious racial slurs'" and "racially demeaning jokes" on a "daily basis" where supervisors, *inter alia*, referred to

"African-Americans, including plaintiff, as 'n****s' and 'lazy n****s.'").

## 2. Imputation of the Harassment on ASI

Defendant contends that even if plaintiff can establish that he experienced severe or pervasive harassment, plaintiff's hostile work environment claim "fails because there is no basis for imputing the harassing conduct to ASI." (Def. Mem. at 16) (citations omitted). The court disagrees.

"As the Second Circuit has noted, '[t]he Supreme Court has ruled that employers are not automatically liable for . . . harassment perpetrated by their employees. In instances where the harassment in the form of a hostile work environment is alleged to have been committed by non-supervisory co-workers, 'an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action.'" *King*, 2009 U.S. Dist. LEXIS 36594, at *40-41 (quoting *Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2d Cir. 2004)).

Where the alleged harassment involves a supervisory employee, "the court first looks to whether the supervisor's behavior 'culminate[d] in a tangible employment action' against the employee 'such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  *King*, 2009 U.S. Dist. LEXIS 36594, at *41 (quoting *Ellerth*, 524 U.S. at 761, 765).  "If the harassment resulted in a tangible employer action, 'the employer will, *ipso facto*, be vicariously liable.'"  *King*, 2009 U.S. Dist. LEXIS 36594, at *41 (quoting *Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir. 2003)).

Defendant contends that Mr. Buzzetta, a tractor foreman, was plaintiff's "co-worker," not his "supervisor," and thus, "ASI cannot be found liable for his alleged actions." (Def. Mem. at 17.)  Defendant asserts that Mr. Buzzetta was not plaintiff's supervisor because he lacked the ability "to take tangible employment action" against plaintiff, "such as the authority to hire, fire, promote, or reassign to significantly different duties."  (Def. Mem. at 17) (quoting *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850-851 (8th Cir. 2005)). The Second Circuit has rejected this definition of "supervisor" as too narrow.  *See Mack*, 326 F.3d at 126 (sexual harassment claim).  Instead, the Second Circuit has held that an individual who has and exercises the authority to make and oversee the daily work assignments of the plaintiff is a supervisor for purposes of establishing an employer's liability for hostile work environment.  *See id.* at 126-127 (citations omitted).

It is uncontested that Mr. Buzzetta was ASI's foreman regularly at the Brooklyn Terminal and exercised authority to make and oversee the daily work assignments of longshoreman at that site. (*See* Def. 56.1 Stmt. ¶ 43.) Accordingly, the court concludes that Mr. Buzzetta was plaintiff's supervisor for purposes of imputing liability to defendant and that defendant may be vicariously liable for Mr. Buzzetta's acts toward plaintiff.

Because plaintiff's alleged harassment did not involve a tangible employment action,[3] defendant ASI cannot be held vicariously liable if it "can establish the affirmative defense set forth in *Ellerth* and *Faragher*." *See Mack*, 326 F.3d at 127. Derived from the Supreme Court cases of *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), the doctrine commonly referred to as the "*Faragher/Ellerth*" affirmative defense provides that, in the absence of a tangible adverse employment action, a defendant employer may be liable for a hostile work environment "unless it successfully establishes as an affirmative defense that (a) it 'exercised reasonable care to prevent and correct promptly any

---

[3] As discussed above, there is no evidence in the record that defendant's alleged failure to train or assign overtime opportunities to plaintiff gives rise to an inference of discrimination.

[discriminatorily] harassing behavior,' and (b) 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Petrosino*, 385 F.3d at 225-226 (quoting *Ellerth*, 524 U.S. at 765); *see King*, U.S. Dist. LEXIS 36594, at *41-42.

With respect to the "reasonable care" element of the *Faragher/Ellerth* affirmative defense, defendant relies on the NYSA-ILA's Employee Handbook and the NYSA-ILA's Anti-Harassment and Anti-Discrimination Policy, which prohibit discrimination, harassment and retaliation, and set forth a procedure that Union employees must follow to report alleged discrimination, harassment or retaliation. (*See* Def. 56.1 Stmt. ¶¶ 69, 72-73.) In this regard, a "defendant may attempt to satisfy the first element by 'the existence of an antiharassment policy during the period of the plaintiff's employment, although that fact alone is not always dispositive.'" *King*, U.S. Dist. LEXIS 36594, at *42 (quoting *Ferraro v. Kellwood Co.*, 440 F.3d 96, 102 (2d Cir. 2006)).

It is undisputed that defendant adopted the NYSA-ILA's anti-harassment policies which specified a procedure for reporting discrimination, and that plaintiff was provided a copy of the Employee Handbook and other written policies. Further,

plaintiff does not dispute the reasonableness of the policies or their complaint procedures. Nor is there any admissible evidence to indicate that the defendant or the NYSA-ILA failed to exercise reasonable care to prevent and correct discrimination, such as by not taking seriously past complaints of discrimination or harassment. Under these circumstances, defendant has established the first element of the *Faragher/Ellerth* affirmative defense.

With respect to the second element of the affirmative defense, which requires defendant to establish that plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities," plaintiff asserts he did not complain of Mr. Buzzetta's conduct because he feared retaliation. Specifically, plaintiff claims that in the summer of 2005, Mr. Buzzetta threatened plaintiff's physical safety by "speeding towards" plaintiff and Mr. Womble in his car and "slam[ing] on the brakes . . . within a foot of hitting [them,]" which prompted Mr. Womble to report the incident to the Waterfront Commission. (Pl. Dep. at 122.) In addition, plaintiff claims that prior to his testimony before the Waterfront Commission in support of Mr. Womble's complaint against Mr. Buzzetta, plaintiff was advised by an attorney, who represented neither plaintiff nor Mr. Womble, to be "sure" before plaintiff went

"through with the complaint" because Mr. Buzzetta would

retaliate.[4]  Plaintiff also testified that following his

testimony before the Waterfront Commission, Mr. Buzzetta told

plaintiff "if you make a complaint against me again, you'll see

what happens."[5]  (*Id.* at 144-145.)

The Second Circuit has held that an employee's

reluctance to avail himself of preventive or corrective

opportunities must be based on a "credible fear" of retaliation.

*See Leopold v. Baccarat, Inc.*, 239 F.3d 243, 246 (2d Cir. 2001)

(citing *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 295-

296 (2d Cir. 1999)).  "A credible fear must be based on more

than the employee's subjective belief.  Evidence must be

produced to the effect that the employer has ignored or resisted

---

[4] Defendant contends that plaintiff cannot rely on the attorney's
statement to establish a fear of retaliation because the
statement is "blatant inadmissible hearsay."  (Doc. No. 32, Def.
Reply Mem. at 8.)  The court disagrees.  The attorney's
statement is not being offered for the truth of the matter
asserted, *i.e.*, that Mr. Buzzetta would retaliate, but to
establish the effect of the statement on plaintiff's state of
mind and to determine whether plaintiff's fear of retaliation
was reasonable.  *See United States v. Puzzo*, 928 F.2d 1356, 1365
(2d Cir. 1991) (noting that evidence offered to show the effects
of statements on a listener, or as proof of the defendant's
state of mind, are not hearsay).

[5] For the same reason, Mr. Buzzetta's statement is not hearsay.
*See Barth v. Village of Mokena*, 03-CV-6677, 2006 U.S. Dist.
LEXIS 19702, at *17-18 (N.D. Ill. Mar. 31, 2006) (holding that
threats of reprisal for complaints of sexual harassment made in
the presence of or directed to the plaintiff were admissible to
demonstrate the effect on plaintiff).

similar complaints or has taken adverse actions against employees in response to such complaints." *Id.; see also Caridad*, 191 F.3d at 295.

The court finds that plaintiff has raised a genuine issue of material fact as to whether he had a credible fear of retaliation. Although there is no evidence that ASI ignored or resisted discrimination complaints in the past, the evidence raises a triable issue as to whether plaintiff's fear of retaliation by Mr. Buzzetta, physical and otherwise, was reasonable. For purposes of defendant's motion, the court assumes that Mr. Buzzetta nearly missed striking plaintiff and Mr. Womble with his car. Even though plaintiff could have complained about Mr. Buzzetta when he was out of Mr. Buzzetta's presence, or when plaintiff testified against Buzzetta before the Waterfront Commission, whether plaintiff's failure to report Buzzetta was reasonable due to his fear that Buzzetta might physically harm plaintiff should be left to a jury. Further, Mr. Buzzetta's cryptic statement "you'll see what happens" following plaintiff's testimony before the Waterfront Commission, combined with the car incident and the attorney's warning regarding retaliation, may persuade a jury that plaintiff had a "credible fear" of retaliation.

Because plaintiff has presented evidence sufficient to raise a material factual dispute regarding whether he failed to utilize the complaint procedures set out in the NYSA-ILA anti-discrimination policies based on his fear of retaliation, the court finds that summary judgment is not appropriate under the *Faragher/Ellerth* affirmative defense.  In so ruling, the court recognizes that plaintiff has not offered any explanation as to why he failed to complain about alleged discrimination that occurred prior to August 3, 2005, the date of plaintiff's testimony before the Waterfront Commission.  Notwithstanding, under the circumstances, the court concludes that plaintiff's failure to complain about previous incidents of hostility implicates plaintiff's credibility, and should be left for a jury's consideration.  *Cf. Cruz v. Liberatore*, 582 F. Supp. 2d 508, 527 (S.D.N.Y. 2008) (holding that an "employee who offers no objective, *ex-ante* evidence to substantiate his fear of retaliation" may not "nonetheless establish a credible fear based on subsequent retaliation").  Accordingly, defendant's motion for summary judgment as to plaintiff's hostile work environment claim is denied.

**D. Retaliation**

Title VII makes it

> an unlawful employment practice for an employer
> to discriminate against any of his employees . .
> . because he has opposed any practice made an
> unlawful employment practice by this subchapter
> or because he has made a charge, testified,
> assisted or participated in any manner in an
> investigation, proceeding or hearing under this
> subchapter.

42 U.S.C. § 2000e-3(a). A plaintiff's retaliation claim is examined applying the same *McDonnell Douglas* burden-shifting analysis used for disparate treatment claims. *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003). A plaintiff makes a *prima facie* showing of retaliation by establishing "participation in a protected activity known to the defendant; an employment action disadvantaging the plaintiff; and a causal connection between the protected activity and the adverse employment action." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir. 1995)).[6]

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). Once a plaintiff has

---

[6] Retaliation claims under the NYSEL, like hostile work environment claims, are governed by the same standards as federal claims under Title VII. *See Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 609 (2d Cir. 2006).

satisfied his *prima facie* burden, the burden of production

shifts to the defendant to articulate a legitimate, non-

discriminatory basis for its action. *See Feingold v. New York*,

366 F.3d 138, 157 (2d Cir. 2004). The burden then shifts back

to plaintiff to demonstrate that the reasons proffered by

defendant were a pretext for retaliatory animus based upon

protected Title VII activity. *See King*, 2009 U.S. Dist. LEXIS

36594, at *50 (citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d

161, 169 (2d Cir. 2006)); *EEOC v. Thomas Dodge Corp.*, No. 07-CV-

988, 2009 U.S. Dist. LEXIS 24838, at *38 (E.D.N.Y. Mar. 25,

2009).

Plaintiff claims that, following his testimony before

the Waterfront Commission in support of Mr. Womble's complaint

of discrimination against Mr. Buzzetta, he was denied the top

loader position in favor of less senior longshoremen, Buzzetta's

harassment intensified and increased in frequency, and he

ultimately was terminated in retaliation for his testimony.

(*See* Pl. Mem. at 8-9, 22; Pl. Dep. 126-128.) In support of his

retaliatory termination claim, plaintiff asserts that his

January 2006 discharge occurred "in very close proximity" to

that his August 2005 testimony before the Waterfront Commission.

(*See* Pl. Mem. at 22.)

Defendant contends that plaintiff has failed to establish any of the required elements of a *prima facie* case of retaliation.  Although defendant addresses plaintiff's retaliatory termination and disparate treatment claims, defendant fails to address plaintiff's retaliatory hostile work environment charge.

As discussed above, plaintiff has failed to satisfy *McDonnell Douglas*'s minimal requirements of a *prima facie* case relating to his claims of discriminatory termination and failure to train and assign overtime opportunities.  Moreover, the court has concluded that plaintiff has failed to rebut, through admissible evidence, defendant's legitimate, non-discriminatory reason for plaintiff's termination, namely, that ASI withdrew plaintiff's sponsorship and effectively terminated his employment because of plaintiff's well-documented history of absenteeism and his permanent bar from industry employment imposed by the NYSA-ILA.

Moreover, plaintiff's contention that his January 2006 discharge occurred four months after his testimony before the Waterfront Commission fails to raise a triable issue regarding plaintiff's retaliatory termination claim.  Claims of retaliation are routinely dismissed when as few as three months elapse between the protected activity and the alleged act of

retaliation. *See Hill v. Citibank Corp.*, 312 F. Supp. 2d 464 (S.D.N.Y. 2004); *Allen v. St. Cabrini Nursing Home, Inc.*, 198 F. Supp. 2d 442, 450 (S.D.N.Y. 2002) (citing *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 84-85 (2d Cir. 1990); *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 185 (S.D.N.Y.1999)); *Ponticelli v. Zurich American Ins. Group*, 16 F. Supp. 2d 414, 435 (S.D.N.Y.1998); *Zenni v. Hard Rock Cafe Int'l, Inc.*, 903 F. Supp. 644, 656 (S.D.N.Y. 1995)).

Based on the foregoing, the court will next address plaintiff's retaliatory hostile work environment claim. "[T]o establish a retaliatory hostile work environment, plaintiff must satisfy the same standard that is applied generally to hostile work environment claims regarding the severity of the alleged conduct." *King*, 2009 U.S. Dist. LEXIS 36594, at *51-52 (citations omitted). The standard for establishing a hostile work environment is discussed above. Although the court has already determined that plaintiff has proffered sufficient evidence to raise a genuine issue of material fact as to whether the workplace was permeated with discriminatory harassment, the court must now determine whether there is sufficient evidence under the summary judgment standard to support a retaliatory hostile work environment claim based upon conduct taking place after plaintiff's testimony before the Waterfront Commission in

which plaintiff reported Mr. Buzzetta's discriminatory conduct toward African-American employees.

With respect to the first element of the retaliation analysis, which requires plaintiff to establish that he engaged in protected activity known to the defendant, defendant disputes that plaintiff's testimony before the Waterfront Commission constitutes "participation in a protected activity." (*See* Def. Mem. at 20.) Specifically, defendant contends that Title VII proscribes retaliation where a plaintiff employee "has made a charge, testified, assisted or participated in any matter in an *investigation, proceeding, or hearing under this subchapter*." (Def. Mem. at 20)(quoting 42 U.S.C. § 2000e-3) (emphasis added by defendant). Defendant cites cases for the proposition that participation in an internal investigation, such as the Waterfront Commission's investigation of Mr. Womble's claims, does not constitute "protected activity" under Title VII (*See* Def. Mem. at 20).

Even assuming that defendant is correct, one of the cases cited by defendant, *Tuthill v. Consolidated Rail Corp.*, No. 96-CV-6868, 1997 U.S. Dist. LEXIS 13304, at *11 (E.D. Pa. Aug. 26, 1997), observes that participation in an internal investigation may constitute "opposition" to "any practice made unlawful" by Title VII. *See id.*, at *8, 11 (observing that

there are "two distinct clauses in Section 704(a) [of the Civil Rights Act of 1964, Title VII]: the 'opposition clause' and the 'participation clause'") (quoting *Robinson v. Southeastern Pa. Trans. Auth.*, 982 F.2d 892, 896 n.4 (3d Cir. 1993)); *see also Deravin v. Kerik*, 335 F.3d 195, 203 n.6 (2d Cir. 2003) (Section 704(a) "has two separate clauses: an opposition clause as well as an independent participation clause.").

The court finds that plaintiff engaged in protected activity. The record indicates that plaintiff voluntarily testified in support of Mr. Womble's discrimination complaint before the Waterfront Commission regarding Mr. Buzzetta's discriminatory conduct toward African-American employees of ASI. Thus, plaintiff opposed a "practice made unlawful" by Title VII.

Next, defendant contends that it was unaware of plaintiff's testimony before the Waterfront Commission. Defendant points out that Mr. Buzzetta denied knowledge of plaintiff's testimony before the Waterfront Commission. (*See* Buzzetta Aff. ¶ 8.) By contrast, plaintiff testified that the day after he testified, Mr. Buzzetta said "if you make a complaint against me again, you'll see what happens." (Pl. Dep. at 144-145.) At a minimum, there is a genuine factual dispute as to whether Mr. Buzzetta knew that plaintiff had testified before the Waterfront Commission.

With respect to the second element, which requires plaintiff to establish an adverse employment action, courts have held that,

> [t]o establish that a retaliatory hostile work environment constitutes a materially adverse change that might dissuade a reasonable worker from reporting activity prohibited by Title VII, a plaintiff must satisfy the same standard that governs hostile workplace claims by showing that the incidents of harassment following complaints were sufficiently continuous and concerted to have altered the conditions of his employment.

*Rasco v. BT Radianz*, No. 05-CV-7147, 2009 U.S. Dist. LEXIS 21540, at *47 (S.D.N.Y. Mar. 17, 2009); *see Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 60 (2006) (holding that an "adverse employment action" is one which would "dissuade [] a reasonable worker from making or supporting a charge of discrimination."); *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 446 (2d Cir. 1999) ("unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action").

As discussed above, plaintiff has proffered admissible evidence that Mr. Buzzetta's harassment intensified and increased in frequency following plaintiff's testimony before the Waterfront Commission. (*See* Pl. Dep. at 126) ("after the complaint that we file[d] at the waterfront he [Buzzetta]

threatened me. . . . [I]t did get worse because the harassment
was even worse . . . . [A]lmost every time I had to go in the
truck, he would say something to me.")  Having previously found
that the discriminatory comments at issue may provide a basis
for a jury's reasonable finding that plaintiff was subjected to
a hostile work environment, the court concludes that plaintiff
has satisfied the third element of a retaliatory hostile work
environment claim.

With respect to the final element, which requires a
causal connection between the protected activity and the adverse
employment action, proof of causation may be shown through
direct evidence or "indirectly, by demonstrating that the
protected activity was followed closely by a retaliatory
action." *King*, 2009 U.S. Dist. LEXIS 36594, at *57 (citing
*Cifra*, 252 F.3d at 217).  Here, plaintiff has put forth direct
evidence of retaliatory motive in the form of Mr. Buzzetta's
alleged comment "if you make a complaint against me again,
you'll see what happens[,]" implying that he would retaliate if
plaintiff complained.  (*See* Pl. Dep. at 144-145.)  In addition,
Mr. Buzzetta allegedly made this comment the day after plaintiff
testified before the Waterfront Commission in support of Mr.
Womble's discrimination charge.  If plaintiff's evidence is
credited, a reasonable jury could find that this comment was

motivated by retaliatory animus.  Accordingly, plaintiff has
presented sufficient evidence to establish a *prima facie* case of
retaliatory hostile work environment.

Because plaintiff has established a *prima facie*
retaliation case, defendant must articulate a legitimate, non-
discriminatory basis for its action.  *See Feingold*, 366 F.3d at
157.  Defendant has failed to do so.  Instead, defendant denies
that Mr. Buzzetta made the discriminatory comments and
threatened plaintiff, thus raising a material factual dispute
for trial.  Accordingly, summary judgment on plaintiff's
retaliatory hostile work environment claim is denied.

### E. Plaintiff's New York City Human Rights Law Claims

The parties disagree over the standard applicable to
plaintiff's NYCHRL claims.  Plaintiff contends that the NYCHRL
"was intended to be more protective than the state and federal
counterpart[s]."  (Pl. Mem. at 19) (quoting *Farrugia v. North
Shore Hosp.*, 820 N.Y.S.2d 718 (Sup. Ct. N.Y. County 2006)).
Plaintiff further contends that the affirmative defense to
employer liability articulated in *Faragher* and *Ellerth* does not
apply to discrimination and retaliation claims under the NYCHRL.
(Pl. Mem. at 17.)  Defendant asserts that "[t]he Second Circuit
has recognized the vitality of the *Ellerth* defense in hostile
work environment claims under the NYCHRL . . . ."  (Def. Reply

Mem. at 8) (citing *Sardina v. United Parcel Serv., Inc.*, 254
Fed. Appx. 108, 2007 WL 4105811 (2d Cir. 2007) (affirming
summary judgment for employer dismissing, *inter alia*, NYCHRL
claim under *Faragher/Ellerth*); *Ferraro*, 440 F.3d 96)).

Plaintiff is correct insofar as "[r]ace discrimination
claims brought under the New York City Human Rights Law are
reviewed under a more deferential analytical framework than
those brought under Title VII." *See Dybdal v. Variable Annuity
Life Ins. Co.*, No. 06-CV-5686, 2007 U.S. Dist. LEXIS 85106, at
*16-17 (E.D.N.Y. Nov. 19, 2007) (citing *Pugliese v. Long Island
R.R. Co.*, No. 01-CV-7174, 2006 U.S. Dist. LEXIS 66936, 2006 WL
2689600, at *11-12 (E.D.N.Y. Sept. 19, 2006)); *see also Wilson
v. N.Y.P. Holdings, Inc.,* No. 05-CV-10355, 2009 U.S. Dist. LEXIS
28876, at *85-86 (S.D.N.Y. Mar. 31, 2009) ("the City HRL's
provisions [are] to be construed more broadly than federal civil
rights laws and the State HRL.") (quoting *Williams v. New York
City Hous. Auth.*, 872 N.Y.S.2d 27 (1st Dep't 2009)).  The Local
Civil Rights Restoration Act of 2005 (the "Restoration Act')",
which amended the NYCHRL, provides, in relevant part, that

> the provisions of New York City's Human Rights
> Law are to be construed independently from
> similar or identical provisions of New York state
> or federal statutes.  Interpretations of New York
> state or federal statutes with similar wording
> may be used to aid in interpretation of the New
> York City Human Rights Law, viewing similarly
> worded provisions of federal and state civil

> rights laws as a floor below which the City's
> Human Rights law cannot fall, rather than a
> ceiling above which the local law cannot rise.

N.Y.C. Local Law No. 85 of 2005, § 1 (Oct. 3, 2005).

Further, while defendant is correct that the Second
Circuit has applied, or assumed the applicability of, the
*Faragher/Ellerth* affirmative defense in NYCHRL cases, the Second
Circuit and district courts have also questioned the
applicability of the affirmative defense under state law and
city law. *See McPherson v. NYP Holdings, Inc.*, 227 Fed. Appx.
51, 54, 2007 U.S. App. LEXIS 15470 (2d Cir. June 27, 2007);
*Zakrzewska v. New Sch.*, 598 F. Supp. 2d 426, 435-437 (S.D.N.Y.
2009) (certifying for interlocutory appeal the issue of whether
"the [*Faragher/Ellerth*] affirmative defense to employer
liability [under Title VII] appl[ies] to sexual harassment and
retaliation claims under New York City Administrative Section 8-
107"), *aff'd and question certified by* 574 F.3d 24 (2d Cir.
2009); *Wilson*, 2009 U.S. Dist. LEXIS 28876, at *85-86 ("While
the precise contours of the amended . . . NYCHRL . . . and its
analytical overlap with the familiar Title VII analysis remain
unclear . . . analysis of the instant claims under a broadly-
construed NYCHRL compels the same result as that reached in the
analysis of Plaintiffs' claims under federal and state law.");
*see also Okayama v. Kintetsu World Express (U.S.A.) Inc.*, No.

66

111494/2005, 2008 NY Slip Op. 31691U, at *11-13 (Sup. Ct. N.Y. County June 12, 2008) (holding that the explicit statutory structure of Administrative Code § 8-107[13][b] precludes the availability of the federal *Faragher/Ellerth* affirmative defense where the conduct of those exercising managerial or supervisory authority is at issue).

As in the *Wilson* case, the court need not determine, at this time, the applicability of the *Faragher/Ellerth* affirmative defense to plaintiff's NYCHRL claims because the record compels the same result – that triable issues exist with respect to plaintiff's hostile work environment and retaliatory hostile work environment claims. Moreover, with respect to plaintiff's disparate treatment claims, which the court has dismissed, "no construction of the NYCHRL, no matter how broad, would compel a different result." *See Wilson*, 2009 U.S. Dist. LEXIS 28876, at *87.

### F. Plaintiff's "Aiding and Abetting" Discrimination and Retaliation Claims

Defendant seeks summary judgment in its favor as to plaintiff's claim that it should be held liable under the NYSEL and the NYCHRL as an aider and abettor of discrimination. (Def. Mem. at 24; *see* Am. Compl. at ¶¶ 41, 51.) Plaintiff has not opposed dismissal of these claims.

The NYSEL and NYCHRL "both make it unlawful '[f]or any person to aid, abet, incite, compel or coerce the doing of any acts forbidden under this article, or attempt to do so.'" *Hopper v. Banana Republic, LLC*, No. 07-CV-8526, 2008 U.S. Dist. LEXIS 13503, at *9 (S.D.N.Y. Feb. 25, 2008) (quoting N.Y. Exec. Law § 296(6); N.Y.C. Admin. Code § 8-107(6)). "The same standards of analysis used to evaluate aiding and abetting claims under the [NYSEL] apply to such claims under the NYCHRL because the language of the two laws is virtually identical." *Feingold*, 366 F.3d at 158 (citation and internal quotation marks omitted).

"If summary judgment is granted on a claim, there can be no secondary liability based on that claim." *Hopper*, 2008 U.S. Dist. LEXIS 13503, at *10 (citing *Forrest*, 3 N.Y.3d at 314). Because the court has granted summary judgment as to plaintiff's disparate treatment claims under the NYSEL and NYCHRL, defendant's motion for summary judgment is also granted on plaintiff's aiding and abetting claims secondary thereto.

Further, to the extent defendant is alleged to have aided and abetted its own discrimination and retaliation, such a claim fails as a matter of law. In *Tomka*, the Second Circuit held that an employee who "actually participates in the conduct giving rise to a discrimination claim," may be held liable under

68

the NYSEL. 66 F.3d at 1317. Here, plaintiff has only sued ASI. Because an employer-defendant cannot aid or abet its own conduct, *see Chamblee v. Harris & Harris, Inc.*, 154 F. Supp. 2d 670, 677 (S.D.N.Y. 2001); *Rivera v. Prudential Ins. Co. of Am.*, No. 95-CV-0829, 1996 U.S. Dist. LEXIS 16337, at *39 (N.D.N.Y. Oct. 21, 1996), and because plaintiff has not named any additional defendant in this action, plaintiff's aiding and abetting claims under the NYSEL and NYCHRL are dismissed.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is denied with respect to plaintiff's hostile work environment and retaliatory hostile work environment claims under Title VII, the NYSEL and the NYCHRL, and granted with respect to the remainder of plaintiff's claims. The parties shall participate in a telephone status conference on November 18, 2009 at 11:30 a.m., which plaintiff's counsel shall initiate.

SO ORDERED.

Dated: Brooklyn, New York
       November 10, 2009

                                    /s/
                                  _____
                                  KIYO A. MATSUMOTO
                                  United States District Judge
                                  Eastern District of New York